WISCONSIN AND MICHIGAN TRANSPORTATION COMPANY, Appellant, vs. PERE MARQUETTE LINE STEAMERS, Respondent.

*November 9, 1932—February 7, 1933.*

For the appellant there was a brief by *Bloodgood, Kemper, Lamb & Passmore,* attorneys, and *Samuel Becker* and *Eric W. Passmore* of counsel, all of Milwaukee, and oral argument by *Mr. Becker* and *Mr. Passmore.*

For the respondent there was a brief by *Alexander, Burke & Clark* of Milwaukee, and oral argument by *Giles F. Clark.*

The following opinion was filed December 6, 1932:

OWEN, J. The complaint alleges that the plaintiff and its predecessors had for many years operated a line of steamships between the ports of Milwaukee, Wisconsin, and the ports of Muskegon and Grand Haven, Michigan, for the purpose of transportation of passengers and freight, and the traffic available over said water route has never been, and is not now, sufficient to support more than one steamship line on said route; that for many years the defendant has been a common carrier engaged in the transportation of freight and passengers between the ports of Milwaukee, Wisconsin, and Ludington, Michigan; that said defendant, well knowing that the freight and passenger traffic on plaintiff's said route, as aforesaid, is not now, and never has been at any time, sufficient to support more than one steamship line thereon, and well knowing that the said plaintiff is amply able to, and does, furnish adequate transportation facilities and service for all traffic, both freight and passenger, available to said route, now threatens to, and intends to, enter upon the said route of the plaintiff, as aforesaid, with its said steamships in competition with the said plaintiff, and intends to render freight and passenger service between said ports at a rate much less than the rates now charged by plaintiff, and at much less than are required to pay the cost of furnishing the service, all for the purpose of greatly damaging the plaintiff and putting the plaintiff out of business.

The plaintiff bases its right to maintain this action upon the provisions of sec. 14 of the Shipping Act of 1916 (now sec. 812, title 46, USCA), which prohibits common carriers by water from using a "fighting ship, either separately or in conjunction with any other carrier, through agreement or otherwise," and a "fighting ship" is defined to be "a vessel used in a particular trade by a carrier or group of carriers for the purpose of excluding, preventing, or reducing competition by driving another carrier out of said trade."

While the demurrer to the complaint raises the question of the extent of the jurisdiction of state courts over maritime matters, and that question has been ably briefed and argued, we do not find it necessary to indulge in its consideration.

The federal supreme court, in *United States Navigation Co. v. Cunard Steamship Co.* 284 U. S. 474, 52 Sup. Ct. 247, has held that the Shipping Board Act is a legislative attempt to apply to common carriers by water, in interstate and foreign commerce, the same principles of regulation and control that are applied to common carriers by land by the Interstate Commerce Act, and that the decisions relating to the power and authority of the Interstate Commerce Commission should apply to the power and authority of the United States Shipping Board established by the Shipping Act in question.

In the *Cunard Case* the United States Navigation Company, a corporation operating ships in foreign commerce, brought suit to enjoin the defendants from continuing an alleged combination and conspiracy in violation of the Sherman Anti-Trust Act. The plaintiff or petitioner operated steamships for the carriage of general cargo between the port of New York and specified foreign ports. The defendants or respondents were corporations engaged in foreign commerce between the United States and specified for-

eign countries, carrying ninety-five per cent. of the general cargo trade from North Atlantic ports in the United States to the ports of Great Britain and Ireland. According to the allegations of the bill, the respondents had entered into and were engaged in a combination and conspiracy to restrain the foreign trade and commerce of the United States in respect of the carriage of general cargo from the United States to the foreign ports named, with the object and purpose of driving the petitioner and all others not parties to the combination out of, and of monopolizing, such trade and commerce. The conspiracy involved the establishment of a general tariff rate and a lower contract rate, the latter to be made available only to shippers who agreed to confine their shipments to the lines of respondents, which differentials thus created between the two rates were not predicated upon volume of traffic or frequency or regularity of shipment, but were purely arbitrary and wholly disproportionate to any difference in service rendered, the sole consideration being their effect as a coercive measure. The tariff rate in numerous instances was as much as one hundred per cent. higher than the contract rate. Many other practices were alleged, all being resorted to for the purpose of coercing shippers to deal exclusively with respondents and refrain from shipping by the vessels of petitioner, and thus exclude it entirely from the carrying trade between the United States and Great Britain.

The court conceded that, "looking alone to the Sherman Anti-Trust Act, the bill states a cause of action under secs. 1 and 2 of that act, and, consequently, furnishes ground for an injunction under sec. 16 of the Clayton Act, unless the Shipping Act stands in the way." The court then points out the analogy between the United States Shipping Act and the Interstate Commerce Act, and declares that "we cannot escape the conclusion that Congress intended that the

two acts, each in its own field, should have like interpretation, application, and effect." Reference was made to the court's declining to take jurisdiction of questions before the Interstate Commerce Commission had acted where "preliminary resort to the commission 'is required because the inquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the commission. Morever, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable; and such acquaintance is commonly to be found only in a body of experts.' " Speaking of the scope of the Shipping Board Act the court said:

"The act is restrictive in its operation upon some of the activities of common carriers by water, and permissive in respect of others. Their business involves questions of an exceptional character, the solution of which may call for the exercise of a high degree of expert and technical knowledge. Whether a given agreement among such carriers should be held to contravene the act may depend upon a consideration of economic relations, of facts peculiar to the business or its history, of competitive conditions in respect of the shipping of foreign countries, and of other relevant circumstances, generally unfamiliar to a judicial tribunal, but well understood by an administrative body especially trained and experienced in the intricate and technical facts and usages of the shipping trade; and with which that body, consequently, is better able to deal."

That provision of the Shipping Board Act here sought to be invoked is the one prohibiting the use of a "fighting ship," which is defined to be a "vessel used in a particular trade by a carrier or group of carriers for the purpose of excluding, preventing, or reducing competition by driving another carrier out of said trade." Whether the defendant's invasion of plaintiff's water route constitutes the use

of "fighting ships" within the meaning of the act, in the language of the federal supreme court in the *Cunard Case,* "may depend upon a consideration of economic relations, of facts peculiar to the business or its history, of competitive conditions in respect of the shipping of foreign countries, [on the Great Lakes], and of other relevant circumstances, generally unfamiliar to a judicial tribunal, but well understood by an administrative body especially trained and experienced in the intricate and technical facts and usages of the shipping trade; and with which that body, consequently, is better able to deal." This subject is no more familiar to a judicial tribunal than was that under consideration in the *Cunard Case.* The issue here presented is no less worthy of expert determination than was that.

Plaintiff points out a difference between this case and the *Cunard Case* and strenuously contends that it is sufficient to justify a different conclusion. The difference between the two cases thus emphasized is that in the *Cunard Case* the unlawful agreements were in full force and effect, and that the respondents were there in full operation pursuant to such illegal agreements, while here the action is brought to restrain not an actual but a threatened violation of the Shipping Act. It is said that the Shipping Board has no power to restrain a threatened violation of the Shipping Act, but that its jurisdiction arises only when and after a violation of the act has been consummated, and that unless a court will take jurisdiction to restrain a threatened violation of the act the plaintiff is without an adequate remedy.

In answer to this contention it is sufficient to say that the only right the plaintiff has is a right afforded by statute, and that the statute which confers the right specifies the remedy by which that right may be enforced. As construed by the federal supreme court, the act requires as a condition precedent to judicial interference that the question of whether

specific shipping practices constitute a violation of the Shipping Act be determined by the Shipping Board. Even though the plaintiff has no remedy until there is an actual violation of the act, it certainly has a right which it did not have prior to the passage of the act, and it must be content to enforce that right by the use of the remedy provided by the act. If there is to be a distinction between the right of a court to interfere before and after an actual violation of the act, that distinction should be left to the statement of the supreme court of the United States. We understand that at least two federal courts have taken the same position. It is conceded by the attorneys in this case that an action to secure the same relief here sought was commenced in the United States district court for the Eastern district of Wisconsin concurrently with the commencement of this action, where a temporary injunction was refused, and upon an appeal to the United States circuit court of appeals a temporary injunction was likewise refused by that court. We do not regard the distinction here urged as being sufficiently substantial to render it becoming to this court to refuse to follow the practice indicated as proper by the supreme court of the United States in *United States Navigation Co. v. Cunard Steamship Co.* 284 U. S. 474, 52 Sup. Ct. 247.

*By the Court.*—Orders appealed from are affirmed.

A motion for a rehearing was denied, with $25 costs, on February 7, 1933.